IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| OMNI TURNPIKE, LLC, | ) | CASE NO.  5:05CV1711 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE ADAMS |
| v. | ) | |
| | ) | MAGISTRATE JUDGE HEMANN |
| SHEETZ, INC., | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | Docket ## 21, 24 |

Pending is the motion of plaintiff, Omni Turnpike, LLC ("Omni"), for partial summary judgment ("Pl. mot."; Docket #21).  Also before the court is the motion of defendant, Sheetz, Inc. ("Sheetz"), for summary judgment ("Def. mot."; Docket #24).  Both motions are opposed.  For the reasons given below the magistrate judge recommends that the court overrule Omni's motion for partial summary judgment and grant Sheetz's motion.

I.

Omni is an Ohio limited liability company.  Sheetz is a Pennsylvania corporation with a principal place of business in Pennsylvania.  The parties assert or do not deny the following relevant facts.

On October 8, 2003 (the "effective date") the parties executed a Lease Agreement ("lease"; Stipulations of Uncontested Facts ("Stipulations"), Docket #22, Exh. 1) relating to commercial property at the intersection of S.R. 8 and Hines Hill Road in Boston Heights,

Ohio.  Omni was the lessor of the property, and Sheetz was the lessee.  The lease had been negotiated by Gregory Baka ("Baka") on behalf of Omni and Steven Augustine ("Augustine") on behalf of Sheetz.

The recitals of the lease indicate that Omni intended to subdivide an approximately eight acre tract at S.R. 8 and Hines Hill Road, 1.94 acres of which would be the demised property upon which Sheetz would construct a gas station and convenience store.  At the time of the signing of the lease, part of an abandoned Days Inn and accompanying parking lot were on the demised property.

The lease included the following relevant sections:

> **Section 2.2  Construction of Lessor's Improvements.**  On or before the Lease Commencement Date, Lessor, at Lessor's cost, shall:
>
> (a) construct any and all off-site road improvements to Hines Hill Road that may be required by the Ohio Department of Transportation . . . ; and
>
> (b) construct the access road off of Hines Hill Road up to Lessee's access cut into its store . . . ; and,
>
> (c)  demolish and clear all structure(s) existing on the Demised Premises.
>
> Except for the obligations set forth above, the balance of the Demised Premises shall be delivered to Lessee in its "As Is" condition, without warranty or representation, except as forth [sic] herein.
>
> **Section 2.3**  Subject to Force Majeure events and other events outside of Lessor's control, in the event Lessor has not completed its demolition and construction obligations under Section 2.2 hereof by December 31, 2003, Lessee, at Lessee's option may upon written notice to Lessor and Lessor's failure to cure the same within thirty (30) days of receipt of such notice, either (a) terminate this Lease; or (b) elect to perform such demolition at Lessor's cost, whereupon Lessor shall reimburse Lessee for the costs of such demolition within (30) days of its submission of a demolition notice.
>
> \*   \*   \*   \*   \*
>
> **Section 3.1  Interim Term.**  The interim term of the Lease ("Interim Term") shall commence on the Lease Commencement Date.  The "Lease Commencement

Date" is defined as that date which is thirty (30) days after satisfaction of all of Lessee's Contingencies as set forth in Article XXI in this Lease; provided, however, that on such date Lessor has completed Lessor's Improvements and demolition activities pursuant to Section 2.2 hereof.  The Interim Term shall end at midnight on the day before the commencement of the Initial Term (as defined below).  Promptly upon the satisfaction of all of Lessee's Contingencies, Lessee shall provide Lessor written notice confirming the occurrence of the same and acknowledging the Lease Commencement Date.

     **Section 3.2  Initial Term.**  The Initial Term of this Lease ("Initial Term") shall be for a period of fifteen (15) years commencing on the earlier of:  (i) the date that Lessee opens for business on the Demised Premises, or (ii) September 30, 2004.

*    *    *    *    *

     **Section 11.3  Lessor's Default.**  It shall be an event of default under this Lease if Lessor fails to observe or perform any of the covenants, conditions, or obligations of Lessor provided for in this Lease and such failure continues for thirty (30) days or more after Lessee gives written notice to Lessor of such default, provided however, that if Lessor is able to commence to cure such default within thirty (30) days, but is unable to complete the cure within thirty (30) days despite the exercise of reasonable diligence, the time to cure shall be extended for so long thereafter as Lessor diligently prosecutes the same.

*    *    *    *    *

     **Section 19.1  Notices.**  Any notice, demand, consent, authorization or other communication (collectively, a "Notice") which either party is required or may desire to give to, or make upon, the other party pursuant to this Agreement shall be effective and valid only if in writing, signed by the party giving such Notice, and delivered (a) personally to the other party, (b) sent by next day express courier or delivery service, providing for a receipt, (c) by registered or certified mail of the United States Postal Service, return receipt requested, addressed to the other party as follows . . . :

    If to Lessor:    Omni Turnpike, LLC
                               c/o Greg Baka
                               Omni Realty Company
                               29225 Chagrin Road
                               Pepper Pike, OH 44122

    With a Copy to:    Gregg S. Levy, Esq.
                               23825 Commerce Park Road, Suite A1
                               Beachwood, OH 44122
                               Ph:  (216) 896-5610 . . .

Unless otherwise specified, Notice shall be deemed given when sent.

\*     \*     \*     \*     \*

**Section 21.1 Lease Subject to Declaration Contingency.** It is specifically understood and agreed that this Lease is subject to and contingent upon the Lessee's final review and approval of the Declaration to be attached hereto as **Exhibit "C"** (the "Declaration Contingency").  Lessee shall have thirty (30) days from submittal of the proposed Declaration to review the same.  If Lessee has requested changes or modifications to the Declaration, Lessee shall provide such requests to Lessor in writing within 30 days pf submittal of the Declaration.  If no changes are requested, within said 30-day period, Lessee shall be deemed to have approved the Declaration.  If the requested changes are timely made and Lessor is unable or unwilling to accept Lessee's changes within 15 days of Lessor's receipt of the changes, then this Lease shall terminate and there shall be no further liabilities or obligations between the parties hereto.

**Section 21.2   Lease Subject to Permitting and Due Diligence Contingencies.**  It is specifically understood and agreed that this Lease is further subject to and contingent upon each of the contingencies and conditions (hereinafter "Condition" and collectively "Conditions"), any and all of which  may be waived in whole, or in part, by Lessee, and to the extent a Condition is within the control of the Lessee, Lessee agrees to use its best efforts to promptly satisfy said Condition.  If any of the following conditions have not been satisfied by Lessor or Lessee (as applicable) or waived by Lessee within two hundred forty (240) days after the Effective Date (the "Contingency Period"), then, thereafter, either party may elect to terminate this Lease by providing written notice of such termination to the other party, provided, however, such election is made prior to the expiration of the Contingency Period.  In the event of termination as aforesaid, there shall be no further liability or obligations on the part of either party to the other under this Lease.

(a)  That Lessee, at Lessee's expense, obtain all applicable permits and approvals under the zoning and building regulations, development ordinances, subdivision ordinances, codes, statutes, laws and directive [sic] of the Village of Boston Heights, County of Summit, the State of Ohio, and all other authorities having jurisdiction (hereinafter "Governmental Approvals"), that will allow the Lessee to obtain all of its permits to proceed with the development, use and occupancy of the Property for a prototypical Sheetz Convenience Store (pursuant to Section 2,1), operating 24-hours per day, with the self-service sale of gasoline, kerosene and other petroleum products, and together with adjacent parking, vehicular access, red, back-lit canopies, signage, and design.  All Governmental Approvals shall be to the satisfaction of Lessee, at Lessee's sole discretion, and in accordance with Lessee's prototypical Convenience Stores (including canopies and signage) and Lessee's site plan attached hereto as **Exhibit "B"** and incorporated herein by reference.

4

> Governmental Approvals shall be deemed to have been obtained when they shall have been issued to the Lessee by the proper authority and the applicable period has fully expired without the filing of an appeal by any other party.

All conditions listed at § 21.2 were required of the lessee.  The conditions not quoted above included obtaining necessary approvals and permits, producing a satisfactory hazardous waste report, obtaining satisfactory results from site tests, obtaining title insurance, obtaining a highway occupancy approval, and confirming the availability of necessary utilities.

During the interim term of the lease, Sheetz was required to pay monthly rent of $6,667.00.  The initial term of the lease was for 15 years, with an option to Sheetz to renew the lease for up to four five-year terms.  Rent during the first five years of the initial term of the lease was $125,000.00 per year, increasing to $137,500.00 per year in the second five years of the lease and to $151,250.00 per year in the last five years of the lease.

As the effective date of the lease was October 8, 2003, the contingency period within which either party could have terminated the lease upon notifying the other party ran from October 8, 2003 through June 4, 2004.  Omni avers that "until June 4, 2004, Sheetz was entitled to terminate the Lease <u>for any reason</u> by providing precise written notice of such termination, pursuant to the method prescribed in Paragraphs 19.1 and 21.2 of the Lease."  Pl. mot. at 2 (emphasis in the original).

An amendment to the lease changed the lessor's obligations.  The amendment, executed at the same time as the lease, read in relevant part:

> 1. Notwithstanding Section 2.2(c) of the Lease, Lessors [sic] obligation to demolish and clear the portion of the hotel building and structure located on the existing Demised Premises by December 31, 2003 as set forth in Section 2.3 of the Lease shall be extended so that Lessor can demolish and clear the same prior to the commencement of the Initial Term as set forth in Section

5

>    3.2 of the Lease.
>
> 2. Except as set forth herein, all terms and conditions of the Lease shall remain in full force and effect.

First Amendment to Lease Agreement ("amendment"), appended to lease.

Sheetz began the due diligence required by the lease shortly after it was signed. In November 2003, however, Sheetz learned that the Ohio Department of Transportation ("ODOT") intended to eliminate the intersection at S.R. 8 and Hines Hill Road as part of a project to convert S.R. 8 into a limited access highway. When Sheetz realized that the planned changes in S.R. 8 would make it extremely difficult for traffic driving north on S.R. 8 to access the proposed store site, Sheetz ceased its due diligence.

Baka met with Mo Darwish ("Darwish") of Summit County in February 2004 about the road improvement project. Darwish told Baka that unless "there was some monumental event" that would cause the planners to revisit the project, the planned improvements would be made. Baka depo. at 167. In April 2004 the Village of Boston Heights declared the Days Inn at the intersection of S.R. 8 and Hines Hill Road a public nuisance.

In May 2004 Augustine met with Baka. Augustine asserts that he told Baka that Sheetz could not move forward until the issue of access from S.R. 8 was resolved. Baka contends that the two "were in an ongoing dialogue related to resolving that issue," but concedes that Augustine told him that Sheetz would not do any further engineering drawings or other site development until the issue of the S.R. 8 improvements was resolved. Deposition of Baka, Def. mot., Attachment 1, p. 97. Baka also states that he and Augustine had been discussing discounting Sheetz's rent based on the impact that the S.R. 8 improvements would have on Sheetz's business. Augustine told Baka that Sheetz would

have difficulty calculating the loss of sales resulting from the impact of the improvements.

Baka asked Augustine to express his concerns about the S.R. 8 improvements in writing so he could take the writing to the Village of Boston Heights and explain to the Village that the proposed changes in S.R. 8 were affecting his ability to lease the site. Augustine sent Baka the following letter dated May 25, 2004:

> Greg Baka
> Partner/Director of Marketing
> Omni Realty Companies
> 29225 Chagrin Blvd. #250
> Pepper Pike, OH 44122
>
> **RE: Sheetz/Omni Realty Lease Agreement    Boston Heights, OH**
>
> Dear Greg:
>
> Pursuant to our meeting last week, followed by a discussion with Joe Sheetz, the "proposed" Route 8/Hines Hill Road Improvement Project continues to deter us from finalizing our Land Development Plan as well as commencing a Long Term Lease with your company.
>
> The latest plans recently received from GPD Associates indicate that access to the proposed "Sheetz" parcel will be greatly altered by these road improvements.  As discussed, our business is based on "convenience" with easy ingress and egress. Road configurations that require customers to utilize service roads in order to access a facility like Sheetz does [sic] not work in our business model.
>
> In the event access to your proposed retail development can be altered in a fashion that ingress/egress from Route 8 is "reasonable" and acceptable to the Sheetz owners, we remain sincerely interested in developing and operating a facility at this location.
>
> As always, please call me with any questions or comments.

Letter from Augustine to Baka, May 25, 2004, Stipulations, Exh. 2.  The letter was signed, "Steve Augustine/Regional Real Estate Director."

Baka does not remember any contact with Sheetz during the remainder of 2004.[1] As of December 6, 2005 Omni had not formally subdivided the property that was the subject of the lease into a 1.94 acre site.[2]  Omni began tearing down the Days Inn on the site in December 2004 and completed the demolition in January 2005.[3]

---

[1] Omni's reply brief contends that this mischaracterizes Baka's testimony.  Omni errs.  Baka testified as follows:

> Q.  And from May 25th, 2004 until March of 2005 you did not have any communication with Steve Augustine about this project?
> A.  There may have been a voice mail, phone attempts for us to just communicate back and forth, but the recollection of them in terms of substance I cannot share with you in any detail.
> Q.  You don't remember that there were any communications from May 2004 until March of 2005 with Steve Augustine?
> A.  Specifically, no.
> Q.  And there was a meeting that you had in February of 2005 with H.C. Fownes and David Hazelet, isn't that correct?
> A.  Yes.
> Q.  Prior to that meeting, had you had any prior communications with H.C. Fownes or David Hazelet about this particular property in Boston Heights at Hines Hill and Route 8?
> A.  I don't believe so.
>
> *     *     *     *     *
>
> Q.  But you don't remember any specific communication between May of 2004 and February of 2005 with Sheetz?
> A.  Not specifically, no.

Baka depo. at 77-78, 83.

[2] In an affidavit Baka contends that Omni constructed an access road to the site in the fall of 2003.  Supplemental Affidavit of Baka, attached to Plaintiff Omni Tutnpike LLC's Combined Brief in Opposition to Defendant's Motion for Summary Judgment; and Reply to Defendant's Opposition (Docket #25), p. 1.  This directly contradicts Baka's deposition testimony.  See Baka depo. at 51-54.

[3] Omni has not removed the parking lot associated with the hotel and argues that it was not part of the hotel structure that the lease requires Omni to demolish and remove.  Omni also did not demolish and remove a hotel sign on Omni's property, although it is not

In February 2005 Baka contacted H.C. Fownes and David Hazelet, the persons at Sheetz who had assumed Augustine's responsibilities, and requested a meeting with them to establish contact as the successors to Augustine. No letters or e-mails were exchanged between these parties at that time. There was also no discussion as to whether Omni and Sheetz were still bound by the lease.

On March 25, 2005, Gregg Levy ("Levy"), counsel for Omni, mailed Sheetz a Declaration of Easements and Restrictive Covenants pursuant to § 21.1 of the lease. Sheetz did not respond to request any changes within 30 days.

On April 27, 2005, Levy sent the following letter to Sheetz:

> On March 25, 2005, I enclosed the proposed Declaration of Easements and Restrictive Covenants ("Declaration") for the above captioned Premises. Pursuant to Section 21.1 of the Lease, Lessee had thirty (30) days from submittal of the proposed Declaration to request any changes or modifications. As Lessee did not request any changes within the said thirty (30) day period, Lessee is deemed to have approved the Declaration, and Lessor has satisfied its Section 21.1 contingency. Furthermore, Lessee has failed to terminate the Lease under the Section 21.2 contingencies as it had not given notice within 240 days of the Effective Date of the Lease that Lessee was terminating the same. Therefore, on June 4, 2004, the Section 21.1 contingencies and the ability to terminate the same have expired.
>
> As a result, I wish to inform you that pursuant to Article II and specifically Section 3.1, the "Lease Commencement Date" shall occur thirty (30) days after the date of this correspondence. We expect that you will commence paying Rent on May 27, 2005.
>
> I also wish to advise you that pursuant to Article XI and specifically Section 11.1(b), Lessee is in default of the Lease for failing to use its best efforts to obtain all applicable permits and approvals, the "Governmental Approvals", to proceed with the development, use and occupancy of the Property for a prototypical Sheetz convenience store pursuant to Section 21.1(a) of the Lease. Therefore, you have thirty (30) days to cure the same.

---

clear whether this sign is on the site to be demised.  *See* Baka depo. at 54-55.

>    I ask that you contact the undersigned immediately to confirm the above as well as detail your cure of the above default.  Your failure to cure the above default shall result in Lessor availing itself to [sic] the remedies in Section 11.2 of the Lease.

Letter from Levy to John Kachur, April 27, 2005, Pl. mot., Exh. C, p. 1.

Sheetz refused to pay the demanded rent to Omni.  On June 1, 2005 Omni filed a complaint against Sheetz in the Summit County Court of Common Pleas, alleging breach of a contract for lease and demanding $2,068,750.00 and other damages.  On July 1, 2005 Sheetz removed the action to federal court.  Omni now moves for partial summary judgment as to liability and Sheetz moves for summary judgment.

## II.  Summary judgment standard

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U. S. 317 (1986).  The substantive law of the case identifies which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party must demonstrate to the court through reference to pleadings and discovery responses the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The nonmoving party must then show the existence of a material fact which must be tried.  *Id.* at 324.

When evaluating a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to . . . the party opposing the motion . . . ."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962); *Aetna Ins. Co. v. Loveland Gas & Elec. Co.*, 369 F.2d 648 (6th Cir. 1966).  This includes taking the nonmoving party's uncontradicted allegations as true and giving the benefit of the doubt to

the nonmoving party's assertions when they conflict with those of the movant.  *Bishop v. Wood*, 426 U.S. 341 (1976); *Bosely v. City of Euclid*, 496 F.2d 193, 197 (6th Cir. 1974).

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e).  *See Celotex,* 477 U.S. at 324.  The nonmoving party may oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves. . . ," *id.*, or by any other evidentiary material admissible at trial. *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993); *see also* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, 10A, § 2721 (1998).  Conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes.  *Lujan v. National Wildlife Fed'n*, 497 U.S. 871 888-89 (1990).  There must be enough evidence that a reasonable jury could find for the nonmoving party.  *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989).

### III.  Breach of contract

The parties do not dispute that they formed a contract on October 8, 2003.  Omni contends that the contract between the parties remains in force, that it has fulfilled its contractual obligations, and that Sheetz is in breach of the contract.  Sheetz answers that it terminated this contract on May 25, 2004 and that Omni has not sufficiently satisfied its own obligations under the contract to allow Omni to hold Sheetz to the contract.

Under Ohio law a party asserting breach of contract must demonstrate (1) the existence of a binding contract or agreement, (2) the nonbreaching party performed its contractual obligations, and (3) the other party failed to fulfill its contractual obligations

without legal excuse. *See National City Bank v. Erskine & Sons*, 158 Ohio St. 450, 110 N.E.2d 598 (1953); *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App. 3d 95, 108, 661 N.E.2d 218, 226 (1995);*Cairns v. Ohio Sav. Bank,* 109 Ohio App. 3d 644, 647, 672 N.E.2d 1058, 1060 (1996). "Upon the breach of an agreement, the law infers damages, and if none are proved, nominal can be recovered." *First Nat'l Bank of Barnesville v. The Western Union Tel. Co.*, 30 Ohio St. 555, 568, 1876 WL 210, at *8 (1876) (citations omitted); *see also Toledo Group, Inc. v. Benton Indus., Inc.*, 87 Ohio App. 3d 798, 807, 623 N.E.2d 205, 211 (1993).

Whether the Augustine letter of May 25, 2004 provided actual or constructive notice of termination of the contract is not easily determined. The applicable caselaw, particularly *Daniel E. Terreri & Sons, Inc. v. Mahoning Cty. Bd. of Commrs.*, 152 Ohio App. 3d 95, 786 N.E.2d 921 (2003), and *McGowan v. DM Group IX*, 7 Ohio App. 3d 349, 455 N.E.2d 1052 (1982), does not provide a conclusive answer. The content of the letter and the prior verbal communications between Augustine and Baka were more ambiguous than those in *Terreri*, although the conduct of the parties after Omni's receipt of the letter indicates that, at the least, the parties understood that the contract had been suspended pending some substantial change in ODOT's plans to modify S.R. 8 at Hines Hill Road. As no such change is alleged to have occurred, Omni's belated rush to perform its contractual obligations is perhaps better explained by its failure to find an alternative lessee than by ignorance that the contract had fallen dormant.[4]

---

[4] Omni's failure formally to subdivide the site from the rest of the property, something that Omni declared it intended to do in the contract's recital, is a good indication of its view of the contract's ongoing relevance.

The court need not decide, however, whether the May 25, 2004 letter provided actual or constructive notice of termination of the contract because Omni has clearly failed sufficiently to perform its duties under the contract to demand that Sheetz fulfill its obligations.  Omni had three primary obligations under the lease:

>	(a) construct any and all off-site road improvements to Hines Hill Road that may be required by the Ohio Department of Transportation . . . ; and
>
>	(b) construct the access road off of Hines Hill Road up to Lessee's access cut into its store . . . ; and,
>
>	(c)  demolish and clear all structure(s) existing on the Demised Premises.

Lease at § 2.2.  The first two obligations were to be performed at Omni's cost before Lease Commencement Day.  The amendment to the lease required Omni to demolish and clear the hotel prior to the commencement of the initial term of the lease.[5]

Baka testified on December 6, 2005 as to Omni's performance of the obligations described in subsections (a) and (b):

>	Q. Turn to page 4, section 2.2, construction of lessor's improvements.  If you could take a look at subparagraph A; so you see that?
>	A. Yes, I do.
>	Q. It envisions that construct [sic] any and all off-site road improvements to Hines Hill Road that may have been required by the Ohio Department of Transportation; do you see that?
>	A. Uh-huh.
>	Q. Have any of those road improvements been completed?
>	A. The current road improvements that are in place, I believe, would have been adequate to allow Sheetz to develop their site as proposed.
>	Q. How do you know that?
>	A. I only know that because it's at grade.  Utilities are at the site.  And at this point in time we've received no notice that we need to make any improvements beyond what exists currently.
>	Q. Has any traffic study, to your knowledge, been conducted at that intersection?

---

[5]  As discussed *infra*, the meaning of the amendment is not entirely clear.

>    A. Not by us individually.
>    Q. Has any official request been made to the Ohio Department of Transportation or any other governmental entity as to what specific off-site road improvements would be required, if any, to your knowledge?
>    A. Not at this point in time. And I believe the reason for that would be driven by end user's requirements and impact.
>    Q. So to your knowledge no request has ever been made to any governmental entity as to what off-site road improvements would be required, if any?
>    A. At this point in time I believe that's correct.
>    Q. And so, therefore, no off-site road improvements have been approved by any governmental entity or constructed by the lessor, correct?
>    A. That would be correct. I --
>    Q. Now, subparagraph B, construct the access road off Hines Hill Road?
>    A. That I believe – that has been installed.
>    Q. And that access road was built to allow for access to go back to the Harley Davidson, correct?
>    A. Correct.
>    Q. And in fact, without that access road there would be no access to the Harley Davidson, correct?
>    A. Correct.
>    Q. So that road was put in at the same time that the Harley Davidson went up for business, correct?
>    A. It was constructed simultaneously with the construction of the building.
>    Q. When did that – the Harley Davidson building?
>    A. My recollection is that store has been open for two winter seasons, so that would have been the end of 2002. I believe they opened in December of 2002 if my memory is correct.

Baka depo. at 51-54.  Thus, of the first two of Omni's primary obligations under the lease, Omni never inquired as to whether there was a need to perform the first obligation and the second obligation was satisfied about eleven months before the lease was signed.

Omni was tardy in performing its obligations pursuant to § 2.2(c) and failed to perform those obligations in their entirety.  Section 2.2(c) obligated Omni to demolish and remove all structures on the site before Lease Commencement Day.  The amendment to the lease provided that "the hotel building and structure located on the existing Demised Premises" need not be demolished and cleared until the commencement of the initial term

of the lease, which was to occur at the latest by September 30, 2004. Amendment; *see* lease at § 3.2. Whether the "structure" in the amendment refers to the parking lot or merely repeats "hotel building" is unclear. In either case, Omni failed timely to demolish and clear the hotel and parking lot. Omni did not begin demolishing the portion of the hotel on the site until December 2004 and did not complete demolition of the hotel until January 2005.[6] Omni has not even begun to demolish and remove the parking lot on the site.[7] A parking lot may be a flat structure, but it is a structure nonetheless.[8] Thus, Omni has failed to satisfy its third obligation pursuant to § 2.2(c) of the lease.

In sum, Omni (1) failed to inquire as to whether there was a need for it to perform pursuant to its first obligation, (2) had no need to perform pursuant to its second obligation because the specified performance had been accomplished before the lease was signed,

---

[6] It is impossible to say whether Omni's motive in demolishing the hotel was an attempt to satisfy its obligations under the contract or a response to pressure from the Village of Boston Heights after the hotel had been declared a public nuisance. *See* Baka depo. at 55.

[7] The amendment provided that "Lessors [sic] obligation to demolish and clear the portion of the hotel building and structure located on the existing Demised Premises . . . shall be extended so that Lessor can demolish and clear the same prior to the commencement of the Initial Term as set forth in Section 3.2 of the Lease." This may be read as allowing Omni to delay demolishing and removing the parking lot until September 30, 2004. But it did not relieve Omni of its obligation to demolish and remove the parking lot. Section 2.2(c) required Omni to "demolish and clear all structure(s) existing on the Demised Premises." The amendment made clear that other than delaying the date by which Omni could remove the hotel (and, perhaps, the parking lot), "all terms and conditions of the Lease shall remain in full force and effect." Amendment at 2.

[8] Ohio law requires that "[c]ommon words appearing in a written instrument will be given their ordinary meaning . . . ." *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St. 2d 241, 241, 374 N.E.2d 146, 148 (1978) (paragraph two of the syllabus). WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, unabridged (Philip Babcock Grove, ed.-in-chief, Merriam-Webster, Inc., 1986), p. 2267, defines "structure" as "something constructed or built." A parking lot is indubitably something constructed or built.

and (3) failed to perform pursuant to its third obligation. The only action that Omni has taken to fulfill its obligations under the lease is to tear down untimely a hotel that was declared a public nuisance. No reasonable factfinder could find under these circumstances that Omni has performed the contractual obligations imposed by the lease. Without such a finding, Ohio law does not permit a conclusion that a breach of the lease has occurred or that damages are owed. Omni's contentions that it has fulfilled its contractual obligations and that Sheetz is in breach of the contract are without merit.

## V. Conclusion

For the reasons given above, the magistrate judge recommends that the court overrule Omni's motion for summary judgment and grant Sheetz's motion for summary judgment.


Date:  September 7, 2007               /s/Patricia A. Hemann
                                       Patricia A. Hemann
                                       United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *United States v. Campbell*, 261 F.3d 628, 631-32 (6th Cir. 2001) (citing *Thomas v. Arn*, 474 U.S. 140 (1985)).